

FILED
CLERK, U.S. DISTRICT COURT

OCT - 5 2021

CENTRAL DISTRICT OF CALIFORNIA
BY        KMH        DEP.

NO CV-71

# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Theophilus Tari Agedah, Kwayee M. Tarty,
Adhnanu Fahed Miri, Quacy Thorne, Roxey Clavel
Kouassi Kouame, Lucson Appolon & Charles Thomas,
Mikhail Shapovalov, Paul White,
Randolph Richards, Festus Musa, Quacy Thorne,
Fazili Chancelier
Jose Susannah, Henry Giovanni,
Jose O. Membreno,Thomas Nganga ET AL.,
by their Priest/Next friend:
Pharaoh Momolu V.S.Sirleaf I.,
Of the **M.A.G.A.** (MAKE AFRICA GREAT AGAIN)
HUMAN RIGHTS ANGELS INTERNATIONAL REGISTRY
[An unincorporated ecclesiastical association]
                          Plaintiffs,

v.

Civil Action No. 2:21-CV-7975-CJC-KK
Jury Demand
VERIFIED COMPLAINT

IMMIGRATION & CUSTOMS
ENFORCEMENT ("ICE"), Seven
Unknown DOE Agents of DHS/CDF/
Oasis/Global Tel Link et al., &
UNITED STATES ex rel.,
 (Sued individually & officially)
                          Defendants.

TORTURE VICTIM PROTECTION ACT
CLASS ACTION LAWSUIT

2

# I. JURISDICTION & VENUE

I. Violations of the Law of Nations. This is a tort action brought under the Alien Tort Claim Act. This court has jurisdiction under Article III of the United States Constitution and 28 U.S.C. s 1350. This court also has diversity jurisdiction over any non-international law claim brought by Plaintiffs because the plaintiffs are in the territory of the United States.

II. The United States District Court for the Central District of California has Diversity Jurisdiction and is an appropriate venue pursuant to the law of nations.

# II. PLAINTIFFS

Theophilus Agedah, a stateless refugee,  Kwayee M. Tarty, a quasi- U.S./Liberian National, Paul White & Randolph Ratcliffe Richards; Jamaican Nationals, Adhnanu Fahed Miri, & Thomas Nganga; Kenyan citizens, Mikhail Shapovalov; a Russian citizen, Jose Susaña & Yerrisson Antonio Rodriguez; Dominican Nationals, Elmer Ottonid Tenas Silva a Guatemalan National, Mr. Luis Espinoza; a Venezuelan National, Quacy Thorne a Guyanese National, Paul Reyes a Mexican National, Jaime Daniel Navarro Cerritos, Jose O. Membreno & Rony Clovel, Rickardo Jose Guido, David Noe Alvarado, Ferardo Molina, Carlos Armando Gomez, Jimmy Nathaniel Sandoval, Santos Portillo, Henry Giovanni, Alex Car-Carmo & Christian Araya; Salvadorian Nationals, Lemos Claro Delis, Rigoberto Duran Cruz, Christian Hernandez Mej'a & Angel Ruiz; Honduran National, Lucson Appolon; a Haitian citizen, & Mandiaye Mamadou Moustapha Sene;Thomas Olu: Ghana citizen, a Senegalese National, Mr. Ronbing Zhang a Hong Kong National, Mr. Garesh Madevapali an Indian National, Kuac Kon a Sudanese National, Kuowame Kouassi an Ivorian/French National, & Boupone Chanthachaem Festus Musa, Quacy Thorne, Charles Thomas, Fazili Chancelier other stateless person ("We", "Us", "Our", "Plaintiffs") are a class of refugees; as defined by the United Nations High Commission for Refugees ("UNHCR").

# III. DEFENDANTS

i.. DOE Defendant ICE/ United States ex rel. is a state actor of the United States acting under color of federal law. Its address is: U.S. Department of Homeland Security
U.S. Immigration & Customs Enforcement
500 12th Street, SW, STOP 5902
Washington, D.C. 20536-5902
ii. DOE Defendant Superintendent Perry, is a state actor of the United States acting under color of state or federal law. his address is: Caroline Detention Facility
11903 S.W.Lewis Memorial Drive
Bowling Green, Virginia 22427
iii. DOE Defendant Chaplain Shoars is a state actor of the United States acting under color of state or federal law. his address is: Caroline Detention Facility
11903 S.W.Lewis Memorial Drive
Bowling Green, Virginia 22427

iv. DOE Defendant Heath Simon (HQ Rio Chief) is a state actor of the United States acting under color of state or federal law. his address is: Caroline Detention Facility
11903 S.W.Lewis Memorial Drive
Bowling Green, Virginia 22427

v. DOE Defendant P. Morin (SDDO) is a state actor of the United States acting under color of state or federal law. his address is: Caroline Detention Facility
11903 S.W.Lewis Memorial Drive
Bowling Green, Virginia 22427
vi. DOE Defendant Michael Coles (DO) is a state actor of the United States acting under color of state or federal law. his address is: Caroline Detention Facility

3

11903 S.W.Lewis Memorial Drive
Bowling Green, Virginia 22427

vii. DOE Defendant J. Collins (DO) is a state actor of the United States acting under color of state or federal law. His address is: Caroline Detention Facility

11903 S.W.Lewis Memorial Drive
Bowling Green, Virginia 22427

viii. Oasis is a commissary vendor acting under color of state or federal law its address is as of now unknown to Plaintiffs and is therefore herein represented as

Caroline Detention Facility
11093 S.W. Lewis Memorial Drive
Bowling Green, Virginia 22427

ix. Global Tel Link is a commissary vendor acting under color of state or federal law its address is as of now unknown to Plaintiffs and is therefore herein represented as

Caroline Detention Facility
11093 S.W. Lewis Memorial Drive
Bowling Green, Virginia 22427

x. Ronnie Sidney is a mental health specialist with ICE Health Service Corp. (IHSE) is a mental health service provider/vendor acting under color of state or federal law its address is as of now unknown to Plaintiffs and is therefore herein represented as

Caroline Detention Facility
11093 S.W. Lewis Memorial Drive
Bowling Green, Virginia 22427

The true names or capacities, whether individual, corporate, associate, or otherwise, and defendantship of DOES i.–x., inclusive, are unknown at the time of the filing of this Tort to Plaintiffs, who therefore sue said defendants by such fictitious names and will ask leave of court to amend this complaint to show their true names or capacities and Defendantship when the same becomes ascertained. Plaintiffs are informed and believe , and based upon said information and belief, allege that each of the defendants designated as a DOE herein was responsible negligently, or in some other actionable manner, for the, events, and happenings referred to herein that proximately caused injury to plaintiffs as herein described.

Next Friend Standing

Pharaoh Momolu V.S.Sirleaf I., of the **M.A.G.A.**(MAKE AFRICA GREAT AGAIN) HUMAN RIGHTS ANGELS INTERNATIONAL REGISTRY [An unincorporated ecclesiastical association] have both priest-penitent privilege, as well as, next friend standing; pursuant to Newell v. Sauser, 79 F.3d  115, 117-18 (9th Cir, 1995), Adam v. James, 784 F.2d 1077, 1081 (11th Cir. 1986) and Rhodes v. Robinson,612 F.2d 766, 769 (3RD Cir. 1969)   to assert the rights of these Plaintiffs. The Plaintiffs' next friend herewith humbly motions this court for sub-class certification. In addition, prays that this court request for the appointment of class counsel to institute this action on behalf of these incompetent Plaintiffs.

4

AFFIDAVIT OF FACTS

I, Pharaoh Momolu V.S.Sirleaf I., of the **M.A.G.A.** (MAKE AFRICA GREAT AGAIN) HUMAN RIGHTS ANGELS INTERNATIONAL REGISTRY, being of sound mind, after first being duly sworn, as a U.S./Liberian National detainee; with permanent allegiance to the U.S. motivated to bring about social change and protect the constitutional rights in the several states of our great Union, as well as, in its ICE detention facilities – as a form of my "political expression" and political association; much as the Supreme Court has held litigation by such organizations as mine that exist outside of the prison setting to be, an exercise of my (as well as the Plaintiffs') rights secured under both the supremacy Clause and the First Amendment to the United States Constitution. Do hereby submit the foregoing "Litigation in good faith" in order to assert the rights of the below mentioned refugees who for valid reasons cannot assert the same due to their incompetence. Wherefore, I declare that Plaintiffs  do aver as follows:

1.  i. Theophilus Agedah, a stateless refugee and member of the Fraihat v. ICE, Case No. EDCV 19-1546JGB (SHKx) April 20. 2020 sub-class,
    and the following men; Kwayee M. Tarty; a U.S. National, Paul White & Randolph Ratcliffe Richards; Jamaican Nationals, Adhnanu Fahed Miri, & Thomas Nganga; Kenyan citizens, Mikhail Shapovalov; a Russian citizen, Jose Susaña & Yerrisson Antonio Rodriguez; Dominican Nationals, Elmer Ottonid Tenas Silva a Guatemalan National, Mr. Luis Espinoza; a Venezuelan National, (. Thomas, R. Clavel, Quacy Thorne a Guyanese National, Paul Reyes a Mexican National, Jaime Daniel Navarro Cerritos, Jose O. Membreno & Rickardo Jose Guido, David Noe Alvarado, Ferardo Molina, Carlos Armando Gomez, Jimmy Nathaniel Sandoval, Santos Portillo, Alex Car-Carmo & Christian Araya; Salvadorian Nationals, Lemos Claro Delis, Rigoberto Duran Cruz, Christian Hernandez Mej`a & Angel Ruiz;  Honduran National, Lucson Appolon; a Haitian citizen, & Mandiaye Mamadou Moustapha Sene;Thomas Olu:Ghana citizen, a Senegalese National, Mr Ronbing Zhang a Hong Kong National, Mr. Garesh Madevapali an Indian National, Kuac Kon a Sudanese National, Kuowame Kouassi an Ivorian/French National, & Boupone Chanthachaem , Festus Musa, Quacy Thorne, Fazili Chancelier other stateless person ("We", "Us", "Our", "Plaintiffs") are a class of refugees; as defined by the United Nations High Commission for Refugees ("UNHCR").

2.  That we Plaintiffs sought refuge in the United States. Moreover, that on or about April 20. 2020, in the Fraihat v. ICE, Case No. EDCV 19-1546JGB (SHKx) this court ruled against the Original Fraihat Defendants and issued Order(s).

3.  However, up to August 14, 2021 (the date of the drafting of this Tort Plaintiffs either were - or are now- indefinitely enslaved in the custody of ICE; "United States of America ex rel.") during a global pandemic, in violation of this Court's Order.

4.  Plaintiffs aver furthermore, that on, or about, September 1, 2021 the Immigrant rights groups (one of which filed an amicus curiae brief in the Fraihat v. ICE, Case No. EDCV 19-1546JGB (SHKx) before this court) Freedom For Immigrants and Free them All Virginia filed Plaintiffs multi individual Civil Rights & Civil Liberties Complaint ("CRCL Complaint") with the Defendants ( as well as, started Plaintiffs' social media campaign respectively) to bring social justice relief from their torture at the hands of our government.

5.  Plaintiffs incorporate by reference anecdotal evidence provided by the Original Fraihat Plaintiffs of conditions in about fifteen additional facilities nationwide.

6.   Although the facts are cumulative, Plaintiffs pray that this Court summarizes the conditions at the Caroline Detention Facility (CDF") in Virginia below, in addition to its summary of the Original Fraihat Plaintiffs, along with any response provide by the government.

**5. Reported Immigration Detention Facility Conditions**

Plaintiffs incorporate by reference evidence provided by the Original Fraihat Plaintiffs of the recent conditions at fourteen facilities in Alabama,
California, Colorado, Georgia, Louisiana, and Texas, including, but not limited to:

**a. Etowah County Detention Center (Gadsen, Alabama)**
**b. Adelanto ICE Processing Center (Adelanto, California)**
**c. Okay Mesa Detention Center (San Diego, California)**
**d. Aurora Contract Detention Facility (Aurora, Colorado)**
**e. Folkston ICE Processing Center (Folkston, Georgia)**
**f. Stewart Detention Center (Lumpkin, Georgia)**
**g. Irwin Detention Center (Ocilla, Georgia)**
**h. South Louisiana ICE Processing Center (Basile, Louisiana)**
**i. LaSalle Detention ICE Processing Center (Jena, Louisiana)**
**j. Pine Prairie Detention Center (Pine Prairie, Louisiana)**
**k. Joe Corley Detention Facility (Conroe, Texas)**
**l. Houston Contract Detention Facility (Houston, Texas)**
**n. Other Facilities**

Plaintiffs incorporate by reference evidence provided by the Original Fraihat Plaintiffs of declarations from legal service providers about the response to COVID-19 at immigration detention facilities in their region.

An immigration legal services provider covering New Jersey facilities with COVID-19 cases reports that transferees continue to arrive in housing units where people exhibited symptoms of the virus. (Saenz Decl. ¶¶ 7-9.)

At Bergen County Jail, clients are locked down in close quarters with their cellmates for all but a few hours a day, have no recreation or phone access, and must use toilets that cannot be flushed regularly. (Id. ¶ 13.)

The conditions at Hudson County Jail in Kearny have been similar. (Id.)
The service provider, New York Immigrant Family Unity Project, submitted release requests to ICE for 16 particularly vulnerable people, but ICE had not answered as of March 23, 2020. (Id. ¶ 15.)

The National Immigrant Justice Center ("NIJC") covers the following facilities: McHenry County Jail in Woodstock, Illinois; Jerome Combs Detention Center in Kankakee, Illinois; Boone County Jail in Burlington, Kentucky; Clay County Detention Center in Brazil, Indiana; Kenosha County Detention Center in Kenosha, Wisconsin; Pulaski County Detention Center in Ullin, Illinois; Dodge County Detention Center in Juneau, Wisconsin; Otay Mesa Detention Center in San Diego California; Cibola County Correctional Center in Milan, New Mexico; and South Texas Detention Complex in Pearsall, Texas. (Zwick Decl. ¶¶ 3-4.)

NIJC notes that "[m]ost clients reported that they received no information whatsoever from ICE or facility staff, much less medical staff, about the virus, and were learning what they knew almost exclusively from watching television." NIJC clients reported lack of access to soap, water, hand sanitizer, disinfectants, or other necessary supplies. (Id. ¶¶ 15-25.)

Another organization, Friends of Miami-Dade Detainees ("FOMDD"), provided anecdotes regarding Krome Service Processing Center in Miami, Florida; Broward Transitional Center in Pompano Beach, Florida, and Glades County Jail in Moore Haven Florida. (Conlin Decl. ¶ 2.)

FOMDD has not been allowed to bring cleaning supplies, masks, gloves, or hand sanitizer to the facilities. (Id. ¶ 4.)

Detainees at these facilities reportedly lack adequate soap and

6

cleaning materials. (Id. ¶ 7.)

7. Plaintiffs further aver that, in 2021, this Controversy arose after the Commonwealth of Virginia (and some of the several States in the U.S., including: New Jersey, Pennsylvania, Maryland, and Boston; i.e., "Jim Crowe ex rel.") claimed that Plaintiffs are had paid our alleged "debts to society", yet Plaintiffs are twice put not just in jeopardy of the loss of our liberty; but have experienced actual injury from the repetitious Article III injuries-in-fact of torture, & indefinite detention/slavery – without due process of law. Moreover, that these injuries are now sustained without bond in the U.S. ex rel./ICE's custody.

8. Moreover, Plaintiffs aver that we have suffered intense continuous torture; due to Virginia's ex post facto Jim Crowe; Truth In Sentencing Law (a "Thing in the Constitution or Laws of [said] state to the Contrary" of the U.S. Constitution "notwithstanding. (Paraphrasing Article VI of the United States Constitution.

9. Which Plaintiffs aver discriminates against aliens like us by reducing the length of time we may have residence in the U.S. via unconstitutionally vague and ambiguous Plea Contracts - which the Commonwealth of Virginia has neither authority - nor jurisdiction to either offer or receive.

10. However, via such Custom & Usage, it has star chambered thousands of minorities and immigrants (with said Jim Crow law - wherewith, neither juries nor defendants are told by: judge, prosecutor, or court appointed counsel - that parole has been abolished in Virginia since 1995.

11. Plaintiffs are aver that we humans are thus coerced into slavery or involuntary servitude; without due process of law (via said unconstitutional plea contracts) and trafficked through the prison industrial complex.

12. We declare herewith this Complaint that said act(s) - or omission(s), are done - in violation of our rights secured under Article III., The Supremacy, & Due Process Clauses of the U.S. Constitution and the Torture Victims Protection Act 28 U.S.C. s 1350 et seq., 42 U.S.C. S 1983, 1985(2) - (3), 1986, & the UN's Convention Against Torture Protocols, the Universal Declaration of Human Rights).

13. We declare that we are enslaved at the Caroline Detention Facility 11093 S.W. Lewis Memorial Drive Bowling Green, Virginia 22427.

14. Plaintiffs aver that Plaintiffs are being tortured and that Plaintiffs are under extreme duress from; inter alia, the psychological trauma Plaintiffs have experienced from our torture at the hands of the "Members of the (Commonwealth of Virginia's) State Legislature, and all [its] executive and judicial Officers" who are "bound by Oath or Affirmation to support (the) Constitution". (Paraphrasing Article VI of the United States Constitution)

15. Plaintiffs declare that our indefinite detention in slavery/involuntary servitude is without bond or due process of law, and thus in violation of the Supremacy & Due Process Clauses of the U.S. Constitution. Moreover, this violates our rights to be protected from torture; via inter alia arbitrary or indefinite detention, and constitutes a human rights violation under the Torture Victims Protection Act 28 U.S.C. § 1350 et seq.

16. Plaintiffs aver that slavery and indefinite detentions – without due process of law is both illegal under United States law, & violation of fundamental human rights, as well as, a violation of universally recognized principles of international law.

17. In addition, proscription of these offenses is universal, obligatory, and definable. Thus, the U.S. ex rel./ICE cannot assert an act of state doctrine defense. (See Forti v. Suarez-Mason (1987, ND Cal 672 F.Supp 1531, later proceeding (ND Cal) 694 F.Supp 676 and reconsideration den, in part (ND Cal) 694 F.Supp 707; see Mendonca v. Tidewater Inc. (2001, ED La) 159 F.Supp 2d 299; see also United States v. Shaw, 2004 U.S. District Court Lexis 15942)

18. Plaintiffs aver that the U.S. is a signatory to the Vienna Convention on Consular Relations (21 U.S. T 77, TIAS No. 6820). see also the Vienna Convention on Consular Relations, the UN's Convention Against Torture Protocols, the Universal Declaration of Human Rights).

19. Moreover, Plaintiffs aver that we are entitled to protections under the aforementioned, as well as, the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons.

20. The Fifth Amendment provides in pertinent part that "[n]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; or be deprived of life or liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation." Moreover, the Fifth Amendment also provides in pertinent part that "[n]o person... shall be compelled in any criminal case to be a witness against himself." (See U.S. Constitution Amendment V.)

21. Plaintiffs aver that the U.S. ex rel. has repeatedly arrested us without foreign national Mirandizing; on our right to contact our Consulates for assistance or representation in any criminal proceeding against me stemming from said arrests. (See Machain v. United States (2000, CA9 Cal) 266 F.3d 1045, 2001 Cal Daily Op Service 7992, 2001 DAR 9872 & Mexico v. U.S. ICJ 2004; see Miranda v. Arizona, 384 U.S. 436, 448-50, 455 (1966); Medellin V. Texas, 552 U.S. 491 505-06 (2008); Beard V. Green, & Mexico v. United States ICJ (2004))

22. Moreover, that our government has unlawfully detained me. Without gaining jurisdiction to sentence us - due to our government's violations of its own Receiving State law "foreign national" Miranda Due process requirements.

23. That our government then proceeded to enter void judgments against us; stemming forth from said Jim Crowe style star chambers. (See Sunal v. Large, 332 U.S. 174, 179, 181-2 (1947))

24. Plaintiffs also aver that, on or about October 1, 1992, the U.S. Department of State issued a notice for Law Enforcement Officials on Detention of foreign nationals. (See October 1, 1992, U.S. Department of State, Consular Notification and Access: Instructions for Federal, State and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist them, Publication 10518 (1998); excerpts of this document are reprinted in Marian Nash (Leich), Contemporary Practice of United States Relating to International Law, 92 Am, J. Int'l. 243 (1998))

25. Plaintiffs aver that we believe that our government's failure to follow the due process requirements of its own Constitution, as well as, Receiving State rules prohibited the Courts from obtaining jurisdiction to sentence us. Moreover, renders said judgments as void judgments.

26. Plaintiffs charge that our government has assumed non-existent Constitutional authority to torture us with involuntary servitude/slavery, without due process of law.

27. Moreover, Plaintiffs charge that our government's acts or omissions in torturing us (while Plaintiffs are thus unlawfully in its custody) without due process of law also runs afoul of the Vienna Convention on Consular Relations, the Convention Against Torture, The Universal Declaration of Human Rights, The United Nations Conference Relating to the Status of Plenipotentiaries on the Status of Refugees and Stateless Persons, as well as, the Thirteenth Amendment, & the Equal protection, Supremacy and Due Process Clauses of the United States Constitution.

8

28. Plaintiffs also aver that these requirements of the abovementioned International pacts – of which our country is signatory - take on particular significance if the court considers what is actually happening to us. Plaintiffs are not "detained"; our government has us in fact, incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to maximum security prison following convictions for violent felonies and other serious crimes. But in sharp contrast to them, the "sum total of procedural protections afforded to" us by our government are far less. *Boumediene*, 553 U.S. at 783.

29. PLAINTIFFS further aver that our government is (as a result of the abovementioned deprivations) unlawfully authorized to afford us no right to court-appointed counsel and no regular right to judicial review of my incarceration. Moreover, that I have no rights analogous to Sixth Amendment speedy trial rights. That Plaintiffs face significantly greater obstacles to acquiring evidence than an indicted or convicted criminal defendant. In addition, because the BIA has placed on us the {2020 U.S. App. LEXIS 15} burden of justifying my release, there is a considerable risk of error in the BIA's findings. In addition, Plaintiffs aver that, that risk is not theoretical: because costly error is actually occurring.

30. Plaintiffs aver that it is in this context that we pray the media and our government will evaluate the issue that is dispositive on this Civil Rights & Civil Liberties Complaint in support of this petition for a redress of our grievances: whether our indefinite incarceration – without Bond - poses Convention Against Torture & due process concerns at this time of our filing of this Civil Rights & Civil Liberties Complaint as a petition for a redress of our grievances and whether additional procedural protections have become necessary.

31. Plaintiffs ask the media and our government to do so under the standard of review for actions brought under 28 U.S.C. Sec. 1350, as well as, the three-factor balancing test as provided in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The three *Mathews* factors are: (1)"the private interest that will be affected by the official action"; (2)"the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3)"the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action." *Id.* at 348.

32. Plaintiffs aver that here, the private interest affected by our government's official action{2020 U.S. App. LEXIS 16} is the most significant liberty interest there is; our interest in being free from torture, slavery, & imprisonment. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004).

33. Plaintiffs argue that case after case instructs us that in this country liberty is the norm and detention "is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). "Plaintiffs have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty." *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992); *see also Hamdi*, 542 U.S. at 529-30.

34. Plaintiffs also aver that in the same vein, "[i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones v. United States*, 463 U.S. 354, 361, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983).

35. Plaintiffs further aver that the deprivations that we are experiencing at our government's hands is not the result of a criminal adjudication. *Compare* 8 U.S.C. 1226(a) *with id.* 1226(c). Nevertheless, Plaintiffs have spent months incarcerated in the Caroline Detention Facility ("CDF"). Moreover, Plaintiffs are exposed to unvaccinated persons. In addition, Plaintiffs have been held alongside criminal gang and cartel members, as well as, detainees who may be criminally insane. *See, e.g., Charles v. Orange Cnty.*, 925 F.3d 73, 78 n.3 (2d Cir. 2019).

36. Plaintiffs also aver that the deprivation(s) we are experience while enslaved/incarcerated in our government's custody is, on any calculus, substantial:

37. Plaintiffs are locked up in jail.

38. Plaintiffs cannot maintain meaningful employment.

39. Plaintiffs have no contact visits and can't maintain meaningful relationships with our family, friends, or others due to the absence of said contact visits.

40. The use of a cell phone is prohibited to us.

41. Plaintiffs have no access to the internet or email.

42. Plaintiffs only have limited access to telephones and no fair telephone rates.

43. Moreover, that we are fed less than the mandatory 2000 daily caloric intake per OSHA, and the General Academy for The Sciences Standard.

44. Furthermore, Plaintiffs are extorted via price fixing, price gouging, and other unlawful predatory corporate practices via CDF's vendor monopolies.

45. In addition, Plaintiffs have no adequate access to health care or second opinions from physicians whom Plaintiffs could trust.

46. Plaintiffs also aver that we were stripped of our personal property (property that they were both allowed to purchase, as well as, possess in prisons) during your intake (including their toenail clippers, beard trimmers, television sets, electronics, shoes, underwear, clothing etc.); and forced to repurchase CDF's (and its predatory vendors") products (which does not include any televisions, trimmers, boxers, briefs, socks, T-Shirts etc.), or use CDF's used underwear & subpar services.

47. Moreover, that Plaintiffs are exposed to loss of life or limb from COVID-19 (and its variants) during a global pandemic.

48. In addition, that our free exercise of our religion (including religious holy day observances, and Kosher or Hallal dietary considerations) is substantially burdened by the U.S. ex rel., i.e., the government; without justification.

49. In addition, Plaintiffs aver that Plaintiffs are repeatedly demeaned and harassed by CDF staff and policies (including being forced to wear degrading clothing like: used boxers, socks, and

50. T-shirts – only two pair - per person. (See CDF Manual attached)

51. Moreover, that Plaintiffs are indefinitely detained (with three other men to a small crowded space, with only one toilet). We are thus deprived of our personal space and right to privacy.

52. Plaintiffs further aver that during lock down and count procedures, Our government has forced us to have to use the toilet with the additional psychological cruel punishment & inhumanity of doing so in full view of the other three males who are confined with us (a compromising situation that makes a mockery out of Congress' intent in passing the Prison Rape Elimination Act ("PREA")).

53. In addition, Plaintiffs are forced to sit in dangerous dining hall table arrangements where rival cartel, gang members (and even rival religious and ethnic sects) are forced by CDF staff to sit and eat together.

54. Plaintiffs also aver that we have limited law and regular library resources (even the "Self-help litigation manual" that CDF provides is for "Prisoners"- proving that CDF itself considers - if not treats) us as a prisoner; not a "detainee".

55. Plaintiffs also aver that we are not allowed access to meaningful education.

56. Plaintiffs are also subjected to the psychological torture of being taken to airports under the impression that we are being deported/released only to find out that we are in fact not being deported and then brought back to the detention facility.

57. In addition, Plaintiffs also aver that our government has provided us with no administrative mechanism {2020 U.S. App. LEXIS 17} by which Plaintiffs can challenge our detention on the ground that it reached an unreasonable length.

58. Moreover, that our indefinite detention under 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded. In addition that absent release on bond, detention lasts through the initial removal determination proceedings (which themselves can take months or years), throughout all inter-agency and federal court appeals, even where an individual has prevailed, and the Government appeals. The longer the duration of our incarceration, the greater our deprivation.

59. Plaintiffs aver in addition that, where the Supreme Court has upheld detention during the pendency of removal proceedings, it has been careful to emphasize the importance of the relatively short duration of detention. *See Demore*, 538 U.S. at 529 (noting the relative brevity of detention under 1226(c), which lasts roughly a month and a half in 85% of cases, and an average of four months in the minority of cases in which the noncitizen chooses to appeal). Plaintiffs' incarceration is lasting much longer than the length of detention under 1226(c) in the vast majority of cases, according to statistics relied on by the *Demore* Court. *Cf. Zadvydas*, 533 U.S. at 701 (holding that presumptive limit to reasonable duration of post-removal {2020 U.S. App. LEXIS 18} detention is six months).

60. Moreover, Plaintiffs aver that even if we sought habeas relief and the district court were to order a new hearing with a shifted burden it is impossible to say how long our enslavement /incarceration will last. For these reasons, Plaintiffs pray that the media and our government will conclude that the first *Mathews* factor cuts sharply in our favor.

61. Plaintiffs additionally aver that the second *Mathews* factor, "the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," would also weigh heavily in our favor. *Mathews*, 424 U.S. at 335.

62. Plaintiffs contend that procedural due process rules are shaped by the risk of error inherent in the truth-finding process. *Id.* at 344. Moreover, at this stage in the *Mathews* calculus, the primary interest is not that of the Government but our interests; the interest of the tortured & detained individuals. *See Hamdi*, 542 U.S. at 530.

63. Plaintiffs swear that here, the procedures underpinning our lengthy incarceration markedly increases the risk of error.

64. First, those procedures seriously impacts our ability to secure bail. *See Moncrieffe v. Holder*, 569 U.S. 184, 201, 133 S. Ct. 1678, 185 L. Ed. 2d 727 (2013).

65. Plaintiffs contend that during our first hearing, charges relating to the abovementioned void judgments against us will be a factor that will be routinely cited by the immigration judge(s) when summarily denying bail.

66. Plaintiffs draw the U.S. ex rel.'s attention to what the court has noted (as cited) above, in{2020 U.S. App. LEXIS 19} the run-up to the our hearing(s), we will seek to resolve our immigration charges but ICE declines to cease its torture of us via, inter alia, slavery/indefinite detention.

67. Plaintiffs also aver that even where information relevant to bail is on file with the Government, we struggle to obtain it. For example, ICE refuses to provide us with internet access to current & necessary information (other than case law etc.) to their cases, which is in the Government's possession and highly relevant. Prior to these immigration hearings even if we submitted Motions or a habeas ad testificandum petition without counsel, and challenged the DHS's Defective Motion to change said venue – those pleadings are never filed or ruled on. *See* 8 C.F.R. 1003.19(e). However, we are enslaved/incarcerated for more months until we receive a hearing.

68. Plaintiffs aver that we are neither a flight risk nor a danger to the community but that we are unable to prove that is the case. Moreover, that our experiences demonstrate the value for torture protection & due process purposes of the burden-shifting required by the courts. In making the relevant inquiry our Government has substantial resources to deploy. Those resources include computerized access to numerous databases and to information collected by DHS, DOJ, and the FBI, as well as information in the hands of state and local authorities. *See, e.g.*, 8 U.S.C. 1373(a)-(b); 1357(g); 1644; *see also* Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017). Moreover, to the extent our Government does not have the necessary information at its fingertips, our Government has broad regulatory authority to obtain it. *See* 8 U.S.C. 1229a(c)(3).

69. Plaintiffs further contend that this court should find any Government arguments under this *Mathews* factor as obviously unconvincing. If our Government argues that the existing bond procedures allow the Honorable court to consider a variety of factors and that bond determinations are reviewable by the BIA. Or if our Government claims that in some cases it has little to no information about a detained individual; like us; perhaps so. But the longer our torture, enslavement, & detention lasts, the less persuasive this "lack of information" rationale becomes. After {2020 U.S. App. LEXIS 21} many months, our Government has not found information sufficient to show that we are a poor bail risk, and indeed, our Government is in possession of important information indicating the contrary. The error that falls on us may be addressed only once the significant resources of the Government are deployed. In short, both the media and our government should consider any "lack of information" contention of our Government's part as inadequate justification for the torture, enslavement, & indefinite incarceration of our person – as individuals who do not pose a heightened national security risk.

70. Moreover, Plaintiffs aver that "as the period of . . . confinement grows," so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention. *Zadvydas*, 533 U.S. at 701.

71. In addition, Plaintiffs aver that the Supreme Court has indicated that the Due Process Clause may entitle even those mandatorily detained under 1226(c) "to an individualized determination as to his risk of flight and dangerousness." *Demore*, 538 U.S. at 532 (Kennedy, *J., concurring*); *see also id.* at 532-33 ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether {2020 U.S. App. LEXIS 22} the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."). Unlike those mandatorily detained under 1226(c), persons subject to detention under 1226(a) like us include individuals with no criminal record, those who have known no country other than the United States, those who are or were protected by DACA and Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), international students with visa issues and lawful permanent residents who have lived in this country for decades, among others. *See also supra*, at 12 n.6. Plaintiffs aver that we believe that our government should concede that individuals such as ourselves, subject to prolonged detention under 1226(a) must be given immediate ankle monitoring supervised release or afforded more process under more strict scrutiny in addition to that provided by the ordinary bail hearing, just as the Supreme Court indicates 1226(c) may be entitled to further process. Immediate ankle monitoring supervised release in addition to a bond hearing ordered by our government may mitigate the risk of error that the *Mathews* factor requires our government to consider.

72. Plaintiffs turn now to the third factor in the *Mathews* analysis: "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Government {2020 U.S. App. LEXIS 23} may correctly note, the Attorney General's discretion to detain individuals under 1226(a) is valid where it advances a legitimate governmental purpose. The Government identifies its regulatory interests in detaining noncitizens under 1226(a) as (1) ensuring that noncitizens do not abscond and (2) ensuring they do not commit crimes. The importance of these interests is well-established and not disputed. *See Zadvydas*, 533 U.S. at 690; *Hernandez v. Sessions*, 872 F.3d 976, 990-91 (9th Cir. 2017) (recognizing validity of the Government's interests but holding that immigration judges must consider a noncitizen's financial circumstances and appropriate alternatives to detention during bond hearings)

73. However, Plaintiffs contend that our Government, will not articulate an interest in the prolonged torture, enslavement, or detention of our soul; as a refugee, U.S. national, or noncitizen who is neither dangerous nor a risk of flight. On the contrary, Plaintiffs believe shifting the burden of proof to our Government, to justify continued torture, enslavement, & detention promotes the Government's interest. Plaintiffs believe this to be paramount in minimizing the enormous impact of enslavement/incarceration in cases where it serves no purpose.  Plaintiffs believe that our Government, cannot convince the Honorable SCOTUS Justices (much less WE THE PEOPLE) that requiring our government, to justify their torture, enslavement, & detention by clear and convincing evidence substantially undermines our government's legitimate interests or entails an undue administrative{2020 U.S. App. LEXIS 24} burden. As noted, ICE and DHS can access the records of other federal agencies and local law enforcement and routinely do so for purposes of the merits proceedings. *See, e.g.*, 8 U.S.C. 1229a(c)(3) (outlining criminal records permissible to establish deportability). Thus, the longer their torture, enslavement, & detention continues, the greater the need for our Government, to justify its continuation.

74. Plaintiffs ask the media, the people, and our government to consider; as THE SCOTUS STARE DECISIS has noted, "[i]n striking the appropriate due process balance the final factor to be assessed is the public interest." *Mathews*, 424 U.S. at

13

347. The public interest considerations include "the administrative burden and other societal costs that would be associated with" the additional process. *Id.* Here again, we contend that this consideration cuts strongly in our favor. Because, when the Government tortures, enslaves, or incarcerates individuals; like us, whom it cannot show to be a poor bail risk for prolonged periods of time, as in this case, it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees. Wherefore, Plaintiffs contend that our Government, can articulate no public interest that any of this their torture, enslavement, or indefinite detention serves. In Addition, we Plaintiffs, show via the Constitution of the United States and its Supremacy Clause, that this court of proper jurisdiction should see none.

75. Plaintiffs furthermore aver, that the purpose of the Alien Tort Claim Act is to impose limitations on even our Government's, ability to do these things herein mentioned. While the Government's interest may have initially outweighed short-term deprivation of their rights, enjoining our government, to cease torturing Plaintiffs with slavery and indefinite detention; we argue, raises liberty interests, of which, balance shifts to our Government. Plaintiffs contend that once called upon to justify torturing them via slavery and indefinite detention – without due process of law - such torture, enslavement, or imprisonment becomes unduly prolonged. Plaintiffs humbly ask our government (specifically the Commonwealth of Virginia) to concede that their prolonged torture, enslavement, and incarceration, which has continued for months without due process of law - nor an end in sight - or a credible determination that we are a danger to national security, or flight risk, even after being deported, violates due process and constitutes torture as defined by 28 U.S.C. Sec. 1350. Plaintiffs further pray that both the media & the public (as well as, the Justices) conclude appropriately in addressing this our Torture Victim Protection Act violations against us via inter alia crimes against humanity like: slavery, & indefinite detention; Complaint in petition for redress/ relief from both the Commonwealth of Virginia, as well as, ICE (and its agents, i.e., Jim Crowe ex rel.)

76. Plaintiffs hope that our government, comes to the conclusion that at any bond hearing, a clear and convincing standard is appropriate. A standard of proof that "serves to allocate the risk of error between us [Refugees]" and that any Justices' conclusion reflect the "relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).

77. Plaintiffs argue that the Supreme Court has consistently held our Government, to a standard of proof higher than a preponderance of the evidence where liberty is at stake, and has reaffirmed the clear and convincing standard for various types of civil detention. *See, e.g., id.*, 441 U.S. at 426, 432-33 (upholding the clear and convincing standard for civil confinement of individuals with severe mental illnesses); *Salerno*, 481 U.S. at 751 (noting that pretrial detention is permitted "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identifiable and articulable threat to an individual or the community"); *Foucha*, 504 U.S. at 75-76 (requiring the same standard for involuntary civil commitment); *United States v. Comstock*, 560 U.S. 126, 130-31, 130 S. Ct. 1949, 176 L. Ed. 2d 878 (2010) (noting the same standard in upholding the constitutionality of a federal statute which permits a continued confinement of a mentally ill, sexually dangerous prisoner beyond a date that the prisoner would otherwise be released); *see also Francis S. v. Stone*, 221 F.3d 100, 101 (2d Cir. 2000) (noting the same standard for civil commitments). Plaintiffs also show that the preponderance standard, the Supreme Court has noted, "creates the risk of increasing the number of individuals{2020 U.S. App. LEXIS 27} erroneously committed" and "it is at least unclear to what extent, if any, the state's interests are furthered by using [it]." *Addington*, 441 U.S. at 426.

14

78. Plaintiffs contend that if our Government claims that these precedents are inapplicable in an immigration context, that this court of proper jurisdiction should find such claims unpersuasive. We quote as one Justice has noted: "[n]owhere did we suggest that the 'constitutionally protected liberty interest' in avoiding physical confinement, even for aliens already ordered removed, was conceptually different from the liberty interest of citizens considered in *Jackson, Salerno, Foucha*, and *Hendricks*. On the contrary, we cited those cases and expressly adopted their reasoning, even as applied to aliens." *Demore*, 538 U.S. at 553 (Souter, J., concurring in part and dissenting in part). Plaintiffs pray to remind such court that your merely invoking the fact that a case is raised in the immigration context does nothing to address much less to abrogate due process principles.

79. Plaintiffs further pray that the public, the media, and our government believes that it is improper to allocate the risk of error evenly between the individual and their Governments when the potential injury is as significant as the individual's liberty. Accordingly, we pray that the public, the media, and our government concludes that a clear and convincing evidence standard of proof provides the appropriate level of procedural protection. *See Singh*, 638 F.3d at 1203-04 (quoting *Addington*, 441 U.S. at 427). Moreover, that the public, the media, and our government therefore concludes{2020 U.S. App. LEXIS 28} & issues both a public declaration that Jim Crowe ex rel.'s acts or omissions as described herein violate the supremacy clause of the United States Constitution, and orders the Government, to prove that we are a danger to the community or national security, or a flight risk, by clear and convincing evidence to justify our torture, enslavement, or indefinite detention "strike(ing) a fair balance between the rights of the individual and the legitimate concerns of the state." *Addington*, 441 U.S. at 431.

80. 46. Finally, Plaintiffs pray that this court of proper jurisdiction will apply the strictest scrutiny to any Government contention that the relief we seek is foreclosed by the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830, 200 L. Ed. 2d 122 (2018). We contend that such an assertion would be directly contradicted by the opinion itself. Because, in *Jennings*, the Supreme Court rejected the argument that the text of various provisions of the INA can be read to give detained noncitizens the right to periodic bond hearings every six months, but it expressly declined to reach the constitutional issues. Justice Alito, for the majority, stated that because the Court of Appeals "had no occasion to consider respondents' constitutional arguments on their merits . . . we do not reach those arguments." *Id.* at 851; *accord German Santos*, 965 F.3d at 210.

81. 47. Wherefore, Plaintiffs pray that such court notices the irony in our Controversy. This is that, in the end, all interested parties will have prevailed. The Government would prevail because it has no interest in the torture via slavery/indefinite incarceration of individuals who it cannot show to be either a flight risk or a danger to their {2020 U.S. App. LEXIS 29} community. We will have prevailed because we will no longer be tortured by slavery/indefinite incarceration. And the public's interest in seeing that individuals who need not be tortured by enslavement in a jail with their tax dollars will also have been vindicated.

## I. BACKGROUND

There is a need to resolve this case or controversy in that it is of major national import. It is of national import because, the Commonwealth of Virginia - like some of the several states in this Union - has thus unlawfully detained thousands of refugees who sought a safe haven in these United States. In addition, Virginia, like some of the several states in this Union, have the non-congressionally authorized Custom and Usage of the maladministration of the public's courts.

Said Custom & Usage under the color of state law has shortened the period during which these immigrants and refugees may have residence. Indeed, Virginia –via Article III injuries-in-fact that stem form its ex post facto Jim Crowe "Truth in Sentencing Act" – as herein mentioned has thus targeted and trafficked refugees, like Plaintiffs, into both the prison industrial complex and Immigration courts. The several states maladministration of the public's courts prevent their sentencing courts from obtaining jurisdiction to sentence refugees like Plaintiffs. Moreover, the several states' failure to obtain jurisdiction to sentence is due to such violations of their own State law foreign national Miranda Due process requirements (as herein mentioned).

The country is in the midst of an unprecedented pandemic, as a result of which hundreds of millions of people have been urged to shelter in place or stay at home. However, some of us are sheltering in more fortunate circumstances than others. The central question presented by Plaintiffs' Tort and Motions is whether the abovementioned facts, in addition to the perversion of the congressional intent in its IIRIRA "Mandatory Detention" statute's language (as it is being misapplied by the Immigration Judges and the Department of Homeland Security) to mean: Indefinite detention until deportation, while subjecting the Plaintiffs to conditions in which refugees held as Immigration and Customs Enforcement ("ICE") detainees are held during the pandemic as a result of said void judgments likely violate the Convention Against Torture and the Due Process, Supremacy Clauses and the Thirteenth Amendment of the Constitution, and if so, what measures can and should be taken to ensure constitutionally permissible conditions of mandatory temporary detention.

### A.   Procedural Background

On August 19, 2019, Faour Abdallah Fraihat, Marco Montoya Amaya, Raul Alcocer Chavez, Jose Segovia Benitez, Hamida Ali, Melvin Murillo Hernandez, Jimmy Sudney, José Baca Hernández, Edilberto García Guerrero, Martín Muñoz, Luis Manuel Rodriguez Delgadillo, Ruben Darío Mencías Soto, Alex Hernandez, Aristoteles Sanchez Martinez, Sergio Salazar Artaga,1 ("Original Plaintiffs"), Inland Coalition for Immigrant Justice ("ICIJ"), and Al Otro Lado ("Organizational Plaintiffs) (collectively, "Original Fraihat Plaintiffs") filed a putative class action complaint for declaratory and injunctive relief. The Defendants are U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), DHS Acting Secretary Kevin McAleenan, ICE Acting Director Matthew T. Albence, ICE Deputy Director Derek N. Brenner, ICE Enforcement and Removal Operations ("ERO") Acting Executive Associate Director Timothy S. Robbins, ERO Assistant Director of Custody Management Tae Johnson, ICE Health Service Corps ("IHSC") Assistant Director Stewart D. Smith, ERO Operations Support Assistant Director Jacki Becker Klopp, and DHS Senior Official Performing Duties of the Deputy Secretary David P. Pekoske (collectively "Original Fraihat Defendants").

On April 15, 2020 the Court Denied Original Fraihat Defendants' motion to dismiss, sever, or transfer venue. (MTD Order, Dkt. No. 126.)
    1

Original Fraihat Plaintiffs replied on April 9, 2020, ("Class Certification Reply," Dkt. No. 111; "PI Reply," Dkt. No. 113), and responded to Original Fraihat Defendants' evidentiary objections, (Dkt. Nos. 97-107). In support of their Replies, Original Fraihat Plaintiffs included the declaration of Elizabeth Jordan, ("Jordan Declaration II," Dkt. No 113-1 (attaching Exhibits A to G, and Appendix 1)), and the supplemental declaration of Homer Venters, ("Venters Declaration II," Dkt. No. 113-2). On April 9, 2020, the Court also received two motions to file amicus briefs. (Dkt. No. 117, 119.) The Court GRANTS the motions and accepts as filed3 the amicus briefs of: (1) Casa de Paz, Church World Service – Jersey City, Clergy & Laity United for Economic Justice, Detention Watch Network, El Refugio, First Friends of New Jersey & New York, and Freedom for Immigrants ("Casa de Paz, et al. Amicus," Dkt. No. 117-2); and (2) Public Health Experts ("Public Health Amicus," Dkt. No. 119-2).

On April 10, 2020, Original Fraihat Defendants filed a supplement to their Opposition, ("Original Fraihat Defendants' Supplement," Dkt. No. 121.)
· COVID-19 Detained Docket Review Guidance, dated April 4, 2020 (April 4 Docket Review Guidance," Dkt. No 121-4).

Original Fraihat Defendants also attached several decisions from district courts, and a recently filed case, regarding the release of immigration detainees or prisoners. (Dkt. Nos. 121-5 to 121-11.)

On April 12, 2020, Original Fraihat Plaintiffs submitted a supplement. ("Jordan Declaration III," Dkt. No. 122 (attaching Exhibits A to D).)

On the morning of the April 13, 2020 hearing, Original Fraihat Defendants submitted supplemented their filing with a recent ICE policy document. (Dkt. No. 124-1.)

After the hearing, Original Fraihat Defendants filed a further factual supplement at the Court's request. ("Holt Declaration," Dkt. No. 125-1.) Original Fraihat Plaintiffs filed an ex parte application to file a response, which the Original Fraihat Defendants opposed. (Dkt. Nos. 127, 128.)
The ex parte application is DENIED AS MOOT.

At the April 13, 2020 hearing, the Court noted that the Original Fraihat Defendants could comment on the Amicus Motions by filing a supplement the next day, but Original Fraihat Defendants declined to do so. The Court found the briefs informative, and absent Original Fraihat Defendants' articulation of a sound reason to reject the briefs, the Court exercised its "broad discretion" to allow them. Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995).

### B. Facts

In this Section the Plaintiffs in the instant complaint concur with what this Court summarized as relevant background on COVID-19, the risk posed to immigration detainees, ICE's system wide actions and inactions in response to that threat, the Original Fraihat Plaintiffs' critique of that response, and the current conditions of confinement at about a dozen facilities nationwide.

### 1. Risk of COVID-19 Spread in Immigration Detention Facilities

The novel coronavirus known as SARS-CoV-2 causes a disease known as COVID-19, and is a viral pandemic. (Meyers Decl. ¶ 20; Venters Decl. ¶ 5.) As of late March 2020, the outbreak was in its early stages in the United States, though cases had been identified in each state, and infection rates are growing exponentially. (Id. ¶ 6.) As of the drafting of this Order, more persons have tested positive for COVID-19 in the United States than in any other country. More than 41,000 deaths have been reported in the U.S., and many tens of thousands more are expected in the coming weeks. Doctors believe the virus is transmitted from person to person by respiratory droplets and...
by touching surfaces, and have found transmission occurs at close quarters of 3-6 feet. (Meyers Decl. ¶ 20.) Currently there is no vaccine available, and everyone is at risk of infection. (Id.) Serious illness and death from COVID-19 is most common among individuals with underlying health conditions like heart, lung, or liver disease, diabetes, or old age. (Id. ¶ 21; Franco-Paredes Decl. at 1.) Available data show a fatality rate about 15% among these high-risk groups. (Id. at 2.) Individuals who survive may experience permanent loss of respiratory capacity, heart conditions, kidney damage, and other complications. (Id. at 4-5.)
The risks of infectious disease in prisons and jails are significantly higher than outside for several reasons. (Meyer Decl.) First, social distancing to prevent the spread of the disease by respiratory droplets is often impossible in "congregate settings," due to poor ventilation and inadequate space, and jails and prisons often lack access to personal protective equipment like masks, gowns and eye shields. (Id. ¶ 9.) Second, jails and prisons often lack resources for diagnosing and treating infectious disease. (Id. ¶¶ 14-15.) Simple segregation or solitary confinement measures as an outbreak management technique tend to backfire: they result in less medical attention and increased chances of death. (Id. ¶ 10; see also Venters Decl. ¶ 10 ("[isolated detainees] quickly experience increased psychological distress that manifests in self harm and suicidality, which requires rapid response and intensive care outside the facility . . .").) Unless an individual is held in a negative pressure room, his or her respiratory droplets may still
flow outwards to the rest of the facility. (Meyers Decl. ¶ 10.) Third, people held in jails and prisons are more likely than others to have chronic underlying health conditions that make them susceptible to infectious disease. (Id. ¶ 13.) Finally, new information about COVID-19 suggests it may be transmissible through shared bathrooms and cell toilets without lids. (Venters Decl. II ¶ 2(a).)

The original parties have submitted hundreds of pages of documents supporting their respective filings, as well as extensive evidentiary objections and responses. To the extent that the Court relies on objected-to evidence, the objections were overruled. Capitol Records, LLC v. BlueBeat,

17

Inc., 765 F. Supp. 2d 1198 n.1 (C.D. Cal. 2010). "District courts, though, 'may give . . . inadmissible evidence some weight . . . [to] prevent[ ] irreparable harm before trial.'" Weride Corp. v. Kun Huan, 2019 WL 1439394, at *5 (N.D. Cal. Apr. 1, 2019) (quoting Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009)).

 For the purposes of the preliminary injunction, "evidentiary issues 'properly go to weight rather than admissibility.'" Id. (quoting Go Daddy Operating Co., LLC v. Ghaznavi, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018)). Thus, the Court took the objections under advisement in considering the Motions.

On April 2, 2020, six ICE detainees and five ICE staff at detention facilities had tested positive for COVID-19. That number has dramatically increased. As of the drafting of the Court's Order, ICE reports 124 confirmed detainee cases at 25 facilities around the country and thirty…
confirmed cases of ICE detention facility staff at many of the same locations.5 Due to shortages in testing nationwide and because asymptomatic individuals may spread the disease, the known cases are likely the "tip of the iceberg." (Venters Decl. ¶ 7.) An immigration facility outbreak would also menace the non-detained: a surge in preventable cases would further strain local hospital and healthcare resources. (Id. at 8; Seaborn Decl., Ex. E at 4 ("a detention center with a rapid outbreak could result in multiple detainees— five, ten or more—being sent to the local community hospital where there may only be six or eight ventilators over a very short period.").) In the "alternate scenario," a facility outbreak is averted and a community's "survival is maximized." (Id. (also noting that many detention centers are in remote areas with limited access to health facilities).)

**2. CDC Guidance and ICE's System wide Response to COVID-19**

On March 6, 2020, ICE Health Services Corp ("IHSC") provided interim guidance to detention facilities. (Venters Decl. ¶ 14.) The ICE website also provides guidance, which is updated periodically. See ICE Guidance on COVID-19, ICE, https://www.ice.gov/covid19. The ICE Guidance purports to incorporate or be consistent with CDC guidance. (Id.)

On March 23, 2020, the CDC issued interim guidance on management of COVID-19 in correctional and detention facilities ("CDC Interim Guidance," Jordan Decl. III, Ex. D.). The guidance mentions many of the same risks of COVID-19 transmission noted above, and notes several others, including: the inability of detainees to exercise frequent hand washing, restrictions on soap or paper towels, the likelihood of introduction of the disease due to staff ingress and degress and detainee transfers, and limited options for medical isolation. (CDC Interim Guidance at 2.) The CDC Interim Guidance provides recommendations on a wide range of topics. The number of ICE staff at detention facilities does not appear to include individuals such as guards, vendors, or medical service providers who work at those facilities and are not employed by ICE. ICE Guidance on COVID-19, U.S. Immigration and Customs Enforcement, including protocols for medical isolation, quarantines, social distancing, prevention by cleaning and disinfecting, pre-intake screening, and temperature checks. https://www.ice.gov/coronavirus. (Id. at 3.)

With respect to detainees at higher risk of severe illness from COVID-19, the guidance notes:
 · They should not be cohorted with other infected individuals, and if cohorting is unavoidable, "all possible accommodations" should be made to prevent transmission;


 · Detained populations have a higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages ; ( Id. at 16, 20.)

- Individuals who are quarantined6 or in medical isolation, should be housed,
- In order of preference, separately in single cells or as a cohort with 6 feet of personal space assigned
- Each individual in all directions. (Id. at 16, 20 (providing six more granular types of preferences
- Based on the type of wall, door, and ventilation).) One of the least desirable quarantine or
- isolation methods is to house detainees in a cohort, in multi-person cells without solid walls or a
- solid door, without excellent ventilation, without social distancing, and without an empty cell
- between occupied cells. (Id.)

After the CDC Interim Guidance was issued, ICE released a second important policy document in the form of Memorandum dated March 27, 2020 ("Action Plan"), which is addressed to detention wardens. (Vick Decl., Ex. 1.) The Action Plan recognizes that the "combination of a dense and highly transient detained population" presents "unique

18

challenges … to mitigate the risk of infection." (Id. at 1.) The Plan applies to ICE-dedicated facilities, but does not apply to "intergovernmental partners and non-dedicated facilities." (Id. at 1.) The Memorandum confirms that ICE views the IHSC recommendations as "best practices," not commands or even performance standards, with the further caveat that the "CDC remains the authoritative source." (Id. at 1, 5 (providing a link to CDC Guidance on COVID-19 in Detention "Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19." CDC Interim Guidance at 4. The guidance notes it is preferable to quarantine individuals in separate rooms. A group of quarantined individuals held in the same living space is called a "cohort." Id. at 3. "Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials . . . ." CDC Interim Guidance at 4. Individuals should be isolated in separate rooms. A group of isolated individuals held in the same living space is also called a "cohort." Id. at 3.

The Action Plan included some, but not all of the CDC policies, and provided advice that sometimes conflicts with the CDC policies.

On April 4, 2020, ICE released docket review guidance, which ordered Field Office Directors ("FODs") across the country to identify individuals in certain CDC-defined categories for heightened risk of death due to COVID-19, and to make individualized determinations regarding continued custody. ("Docket Review Guidance," Dkt. No. 121-4.)

Per the Docket Review Guidance, vulnerable detainees who are mandatorily detained do not receive any consideration, however. The Docket Review Guidance was described in greater detail in the next Section.

Most recently, on April 10, 2020, ICE Enforcement and Removal Operations ("ERO") issued COVID-19 Pandemic Response Requirements. ("Pandemic Response Requirements," Dkt. No. 124-1.)

The Pandemic Response Requirements set forth "mandatory requirements" for all facilities housing ICE detainees as well as best practices. (Id. at 3.) Dedicated detention facilities—those housing only ICE detainees—as well as non-dedicated facilities with mixed populations, including local jails, "must" (1) comply with their applicable detention standards and facility contract8; (2) comply with the CDC Interim Guidelines and the March 27, 2020 Action Plan; (3) notify the local FOD and FMC of known or suspected COVID-19 cases; and (4) notify the FOD and FMC "as soon as practicable" of any detainee meeting CDC's criteria for higher risk of harm, (id. at 5-7).

Whereas the April 4, 2020 Docket Review Guidance drew the line for vulnerable individuals at sixty years of age and listed pregnancy as a qualifying condition for release, the Pandemic Response Requirements raise the age to 65 and omit pregnancy.

The Pandemic Response Requirements also state all facilities housing ICE detainees must:

· Instruct staff and detainees to wear cloth face coverings when PPE supply is limited;

· Provide staff and detainees with no cost unlimited access to supplies for hand cleansing, including liquid soap, water, paper towels or dryers, and no-touch receptacles;

· Require all persons in the facility to avoid touching their eyes, nose, or mouth without cleaning their hands first;

· Prohibit sharing of eating utensils, dishes, and cups;

· Prohibit non-essential contact such as handshakes, hugs, and high-fives;

· Staff should clean shared equipment like radios and weapons;

· where possible, restrict transfers of detained non-ICE populations and facilities.

This Court observed that different detention standards apply to different facilities.
Thus, some facilities would only comply with the legacy Immigration and Naturalization Service 2000 National Detention Standards, whereas others would comply with more recent Performance-Based National Detention Standards, which came out in 2008 and were revised in 2011 ("PBNDS"). See ICE Detention Standards, https://www.ice.gov/factsheets/facilities-pbnds.

19

· "Efforts should be made" to reduce the population to approximately 75% of capacity, to promote social distancing (Id. at 7-14.)

In addition, the Pandemic Response Requirements for the first time acknowledged the CDC's tiered housing preferences for individuals under medical isolation (e.g. separate single cells with solid walls and door are much preferable to cohorted multi-person cells without solid barriers). (Id. at 15.)

The Response Requirements also noted that if the number of confirmed cases at a facility exceeds individual isolation spaces, ICE must be promptly notified to arrange transfer.

For additional operational background, the Original Fraihat Defendants provide the declaration of the Deputy Assistant Director for Clinical Services and Medical Director of IHSC. (Vick Decl., Ex. 2 ¶ 1.)

The IHSC Deputy Assistant Director oversees clinical services at the 20 IHSC-staffed facilities, which hold approximately 13,500 detainees. (Id. ¶ 2.)

The Deputy Director stated that IHSC was following CDC guidance in testing for COVID-19, but did not specify what the guidance calls for. (Id. ¶ 9.)

Similarly, she stated ICE has a pandemic workforce protection plan and that ICE instituted "applicable parts of the plan" in January 2020, but she did not attach excerpts of the plan, specify what the plan requires, or explain how it will address the needs of medically vulnerable detainees. (Id. ¶ 6.)

ICE appeared to be engaging in at least some centralized monitoring of facility conditions, though the Original Fraihat Defendants did not submit evidence that they were enforcing IHSC or CDC guidelines at all ICE facilities. The best evidence of coordinated pandemic tracking is the ICE website, which is regularly updated with information about reported staff and detainee COVID-19 cases.

Second, IHSC Field Medical Coordinators ("FMCs") receive reports from medical leadership at contract facilities.9 (Id. ¶ 11.) Each facility is supposed to report to FMCs any detainee they identify as "meeting CDC requirements for cohorting monitoring, or isolation." (Id.)

Until April 10, 2020, the Original Fraihat Defendants did not require facilities to provide ICE with information about which detainees were most vulnerable to severe illness or death from COVID-19. Original Fraihat Defendants did not provide information about any independent tracking they conduct with regard to disabled or medically vulnerable individuals before or during the pandemic.

### 3. Individualized Release Determinations

The number of individuals in ICE custody has slightly decreased since the declaration of a national emergency. As of March 13, 2020, ICE had 35,980 single adults in custody. (Holt Decl. ¶ 13.) More than half of ICE's average daily population at that time had not been convicted of a criminal offense and had no pending criminal charge. (Seaborn Decl., Ex. F.) A month later, on Further declarations submitted by the Original Fraihat Defendants clarified that FMCs "oversee" clinical services at Intergovernmental Service Agreement Facilities ("IGSA"), and "ensure" the medical care provided by contractors meets detention standards under the contract. (Vick Decl., Ex. 2 ¶¶ 2-3.) The FMCs "monitor" but do not provide hands-on care, or direct the care. (Id.)

On April 13, 2020, ICE indicated that 31,709 individuals were in its custody, (Holt Decl. ¶ 13), of whom approximately 14,000 have no prior criminal conviction and no pending criminal charges.

There are a number of tools available to ICE to decrease population density or to release medically vulnerable individuals. ICE may choose to release people on bond or conditional parole, and in the past, has exercised detention authority to release individuals with serious vulnerabilities or medical conditions. (Saenz Decl. ¶ 18.)

Under previous Republican and Democratic Administrations, agency policy and practice was to limit detention of noncitizens who are pregnant or nursing, elderly, or suffer from serious physical or mental illness. (Lorenzen-Strait Decl. ¶ 4-7 (noting that this authority was also exercised to release individuals vulnerable to medical harm but not yet ill).) Even individuals required to be detained by statute can be and were released pursuant to ICE guidelines and policies, and statutory and regulatory provisions. (Id. ¶ 2 (citing INA §§ 212(d)(5), 235(b), 236, 241; 8 C.F.R. §§ 1.1(g), 212.5, 235.3,
236.2(b)); Sweeney Decl. ¶¶ 2-5.

But see Holt Decl. ¶ 10 (noting ICE's current policy does not allow the exercise of discretion to release those subject to mandatory detention even if at higher risk for COVID-19.)

In recent years, legal services organizations observed an increase in parole denials by ICE. (Rivera Decl. ¶¶ 14-16; Corchado Decl. ¶ 23.) Since the pandemic, medically vulnerable detainees have had parole requests denied, (Rivera Decl. ¶ 13), pending for weeks without decision, (Corchado Decl. ¶ 13; see also Rios Decl. ¶ 25), or have not been able to secure hearings at all. For example, the Chicago ICE field office indicated it was closed, leaving attorneys and clients uncertain if they would receive a decision. (Zwick Decl. ¶ 34.)

In the absence of prompt system-wide action by ICE to address the threat of COVID-19, dozens of detainees and their counsel filed individual and group habeas petitions for release.

The Original Fraihat Plaintiffs included an appendix of twenty-nine such petitions. (Jordan Declaration II, Appendix 1.)

In all but six of the cases the petitioners secured release. (Id.) In many of the cases where release was not secured, the petitioners obtained another form of relief, including a bond hearing or class certification, or their request was denied without prejudice.

Original Fraihat  Defendants, in turn, submitted four immigration habeas decisions in which the court did not find a likelihood of success on the merits, one criminal release decision, and one recently filed habeas petition. (Dkt. Nos. 121-5 to 121-11.)

On April 4, 2020, ICE issued Docket Review Guidance to ICE FODs providing for the potential release or use of alternatives to detention for detainees vulnerable to serious illness or death from COVID-19. The Docket Review Guidance notes that on March 18, 2020, FODs were instructed to review the cases of noncitizens over the age of 70 or pregnant to determine whether continued detention was appropriate. (Id. at 1.)

The April 4 Docket Review Guidance notes the categories are expanded to include:
 · Pregnant detainees or those having delivered in the last two weeks
10 ICE Currently Detained Population, https://www.ice.gov/detention-management.

 · Detainees over 60 years old

 · Detainees of any age having chronic illnesses which would make them immune compromised, including but not limited to:
 o Blood disorders
 o Chronic kidney disease
 o Compromised immune system
 o Endocrine disorders
 o Metabolic disorders
 o Heart disease
 o Lung disease
 o Neurological and neurologic and neuro development conditions (Id. at 1-2.)

The Docket Review Guidance asks FODs to "please" identify "all cases within your [areas of responsibility] that meet any of the criteria above and validate that list with assistance from IHSC or your [FMC] to ensure the conditions listed

are still present and do result in the detainee potentially having a higher risk for serious illness from COVID-19." (Id. at 2.)

The guidance went on to request FODs to review these cases to determine whether ongoing detention is appropriate, but noted that presence of a risk factor "may not always be determinative." (Id.)

The guidance did not acknowledge that individuals who are detained under 8 U.S.C. § 1226(c) may be released, and remarked that even in cases of discretionary detention, an at-risk individual should not be released in cases of potential danger to property or persons. (Id.)

In a supplemental filing ICE noted individualized release determinations began prior to the April 10, 2020 Docket Review Guidance. (Holt Decl. ¶ 10.)

Since March 2020, ICE had released 693 individuals using a methodology similar to the Docket Review Guidance. (Holt Decl. ¶ 10.) ICE did not state how many eligible detainees have been identified, and noted that the time needed for each review depends on the complexity of the case. (Id. ¶ 11.)

**4. Plaintiffs' Criticisms of ICE's System wide Action or Inaction**

Plaintiffs sharply criticize ICE's March 6, 2020 guidelines. For example, the guidelines focus on questionnaires, rather than checking for active symptoms of staff, and tend to ignore that COVID-19 has arrived in full force and can be carried by asymptomatic individuals and is constantly mutating into new more virulent variants.

 In addition, the guidelines do not include access to hand sanitizer and use of
masks for individuals with a cough; do not include guidance for administrators to plan surge capacity needs; do not provide guidance on when to test patients for COVID-19 other than by reference to the CDC; do not propose identification of individuals with high risk of illness and death from COVID-19; and largely ignore CDC guidelines for social distancing strategies.

To the extent ICE envisions use of "isolation rooms," Plaintiffs contend, most
facilities only have 1-4 rooms that fit that definition and so will be quickly overrun.

Plaintiffs argue that even after the March 27, 2020 Action Plan and April 4
Docket Review Guidance, ICE's systemic response to the COVID-19 pandemic falls short of CDC benchmarks. (See Original Fraihat PI Reply at ; Venters Decl. II.) Dr. Venters notes several discrepancies and gaps in ICE's global response, including that it:

· Does not require symptomatic detainees be given a mask and placed in medical isolation;

· Does not mandate nose and mouth coverings for those who cannot engage in social distancing;

· Does not present a plan for isolation when the number of people needing to be isolated exceeds existing isolation rooms or cells;

· Does not limit transportation of detainees;

· Does no identify what precautions should be taken to protect people with risk

· Fails to include certain risk factors identified by the CDC and which FODs and their staff may not be aware;

· Delegates medical screening for custody review to FODs and staff who are not medical professionals, and advises them to check with medical professionals only after the fact;

· Does not urgently command risk factor screening measures, but merely requests them, without any timeline;

· Fails to account for the fact that detained populations are 10-15 years more progressed than chronological age;

· Does not ensure risk factors reflect evolving data and science;

· Does not include nationwide surveillance, coordination, or communication measures. (Venters Decl. ¶¶ 3-4.)

Plaintiffs also argue that ICE systematically fails to track individuals with disabilities and medical vulnerabilities at CDF, both before and during the COVID-19 pandemic.

 In support of this contention, they incorporate by reference an Office of the Inspector General report, which discusses ICE's Risk Classification Assessment ("RCA") tool, which was designed to assist with release and custody classification decisions. ("OIG Report," Jordan Decl., Ex. A.)

The OIG Report explained that when ICE Enforcement and Removal Operations ("ERO") detains a noncitizen, it uses the RCA to generate recommendations for detention or release, including for alternatives to detention, unless the person is mandatorily detained. (Id. at 5-6.)

Said OIG Report provided some information on at least one of ICE's screening mechanisms: it noted that RCA questions on "special vulnerabilities" conflict with ICE's Performance Based National Detention Standards ("PBNDS") medical screening guidance. For example, an ICE ERO officer using the RCA tool does not have medical training and might not ask questions in a private setting, whereas the PBNDS call for someone with training—a medical professional or trained detention officer—to conduct the screening. (Id. at 12.) The OIG Report contrasts the PBNDS medical screening questions, which include 31 fields, with the RCA special vulnerabilities "checklist" which includes only yes/no data fields for (as relevant to this case) "serious physical illness," "disabled," "elderly," and "pregnant." (OIG Report, Appendix G, at 29.)

Apart from this limited tool, and any reports provided by facilities to IHSC FMCs regarding detainee health, it appears ICE does not have a centralized screening, let alone tracking, mechanism or procedure to identify medically vulnerable or disabled individuals in its custody during the COVID-19 pandemic. Plaintiffs repeat the refrain from their Complaint that ICE has failed to ensure compliance with detention standards, and this failure extends to COVID-19 protocol compliance.

.

**II. LEGAL STANDARD**

**A. Provisional Class Certification**

Courts in the Ninth Circuit "routinely grant provisional class certification for purposes of entering injunctive relief." Carrillo v. Schneider Logistics, Inc., 2012 WL 556309, at *9 (C.D.
Cal. Jan. 31, 2012) (citing Baharona-Gomez v. Reno, 167 F.3d 1228, 1233 (9th Cir. 1999)).
Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions. A party seeking class certification must establish the following prerequisites:
(1) The class is so numerous that joinder of all members is impracticable; (2) there
are questions of law or fact common to the class; (3) the claims or defenses of the
representative parties are typical of the claims or defenses of the class; and (4) the
representative parties will fairly and adequately protect the interests of the class.
Fed. R. Civ. P. 23(a). After satisfying the four prerequisites of numerosity, commonality,
typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that
separate actions would create incompatible standards of conduct for the defendant or prejudice
individual class members not parties to the action; (2) the defendant has treated the members of
the class as a class, making appropriate injunctive or declaratory relief with respect to the class as
a whole; or (3) common questions of law or fact predominate over questions affecting individual
members and that a class action is a superior method for fairly and efficiently adjudicating the
action. See Fed. R. Civ. P. 23(b) (1)-(3).19

A trial court has broad discretion regarding whether to grant a motion for class certification. See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). However, "[a] party seeking class certification must affirmatively demonstrate [] compliance with [Rule 23]—that is, [the party] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Id. at 351. "Courts typically proceed claim-by-claim in determining whether the Rule 23 requirements have been met, particularly as to the Rule 23(a)(2) and (b)(3) requirements of common questio[ns] and predominance." Allen v. Verizon California, Inc., 2010 WL 11583099, at *2 (C.D. Cal. Aug. 12, 2010).

Rule 23 further provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the

19 While some circuits have adopted an "ascertainability" prerequisite to certification, the Ninth Circuit has not. Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017).

Case 5:19-cv-01546-JGB-SHK Document 132 Filed 04/20/20 Page 20 of 39 Page ID #:2638

Page **21** of **39 CIVIL MINUTES—GENERAL** Initials of Deputy Clerk MG

"class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5). "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981).

## LEGAL THEORY

TORTURE VICTIM PROTECTION ACT of 1991. Act march 12, 1992, P.L. 102-256, 106 Stat. 73, provide:
'Section 1. Short title
'This Act may be cited as the torture Victim Protection Act of 1991'.
'Sec.2 Establishment of civil action
'(a) Liability. An individual who, under actual or apparent authority, or color of law, of any foreign nation –
  (1)  subjects an individual to torture shall, in a civil action, be liable for damages to that individual: or
  (2)  subject an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual legal representative, or to any person who may be a claimant in a action for wrongful death,
'(b) Exhaustion of remedies. A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.
'(c) Statue of limitation. No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose.
'sec.3.Definition

'(a) Extrajudicial killing. For the purposes of this Act. The term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees witch are recognized as indispensable by civilized peoples. Such terms, however, does not include any such killing that, under international laws is lawfully carried out under the authority foreign nation.
'(b) Torture. For the purposes of this Act-
'(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other then pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession. Punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
"(2) mental pain and suffering refers to prolonged mental harm caused by or resulting from-
"(A) the intentional infliction or threatened infliction of severe physical pain or suffering
"(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
"(C) the threat of imminent death; or...

"(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or procedures calculated to disrupt profoundly the senses'

## V. LEGAL CLAIMS

12. Plaintiffs re-allege and incorporate by reference paragraphs 1 – 47.

13. The Supremacy & Due Process clauses of the U.S. Constitution (and Appellant's rights secured thereunder), as is Congress who ordained or established such inferior Courts. Moreover, the several states' legislatures, and all executives and judicial Officers, both of the United States and of the several states are also Bound by their Oath and Affirmation to support the United States Constitution – if they are to "Keep" this "republic" that our distinguished Framers left us. (Quoting Thomas Jefferson see also Article VI of the U.S. Constitution.)

The indefinite detention of Plaintiffs without bond and in violation of the Supremacy & Due Process Clauses of the U.S. Constitutional violated plaintiffs' rights to be protected from torture; via inter alia arbitrary or indefinite detention, and constituted a human rights violation under the Torture Victims Protection Act 28 U.S.C. § 1350 et seq. in addition to the Convention Against Torture Act. Plaintiffs are both refugees, as well as, immigration detainees with a range of serious health conditions.

Together Plaintiffs claim Defendants have failed to ensure minimum lawful conditions of confinement at CDF immigration detention facility.

Plaintiffs assert seven claims: (1) Due Process Clause of the Fifth Amendment - failure to monitor and prevent "Challenged Practices" (all Plaintiffs and the Class against all Defendants); (2) Due Process Clause of the Fifth Amendment – violation of the Supremacy Clause via violations of the Vienna Convention on Consular Relations and Convention Against Torture Act – (Subclass against all Defendants); (3) Due Process Clause of the Fifth Amendment - failure to monitor and prevent "Disability-Related Practices" that constitute punishment ( Disability Plaintiffs, and Disability Subclass against all Defendants); (4) violation of § 504 of the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794 (Disability Plaintiffs, and Disability Subclass against DHS, ICE, and IHSC) (5) Due Process Clause of the Fifth Amendment – violation of the Supremacy Clause via violations of the Convention Against Torture Act – (Subclass against all Defendants); (6) Due Process Clause of the Fifth Amendment – violation of the Supremacy Clause via violations of the Convention Against Torture Act in violation of the Thirteenth Amendment of the Constitution (Subclass against all Defendants); (7) Due Process Clause of the Fifth Amendment – violation of the Supremacy Clause & Convention Against Torture Act via violations of the Fourteenth Amendment of the Constitution (Subclass against all Defendants).

On April 15, 2020 the Court Denied the Original Fraihat Defendants' motion to dismiss, severe, or transfer venue.(See *Faour Abdallah Fraihat, et al. v. U.S. Immigration and Customs Enforcement, et al.* EDCV 19-1546 JGB (SHKx) Date April 20, 2020 (MTD Order, Dkt. No. 126.)) However, the defendants are still in noncompliance with this Court's order(s).

14. Plaintiffs have no plain adequate or complete remedy at law to redress the wrongs described herein. Plaintiffs have been and will continue to be irreparably injured by the conduct of the Defendants and each of them UNLESS THIS COURT GRANTS THE DECLARATORY AND INJUNCTIVE RELIEF WHICH PLAINTIFFS SEEK. IN WITNESS WHEREOF, I have executed this Torture Victims Protection Act Lawsuit , via Counsel, asserting my rights, as well as, the rights of the abovementioned refugees who could not assert their rights for themselves, on this 16th day of August, 2021.

82. I, Pharaoh Momolu V.S.Sirleaf I., of the **M.A.G.A.** (MAKE AFRICA GREAT AGAIN) HUMAN RIGHTS ANGELS INTERNATIONAL REGISTRY. declare that I AM son of Adam, as well as, Son of both Cham & Cush.

83. Moreover, I declare that I AM: Son of Abraham, Son of Afˈr(ica), Son of Yeshua/Israel Ha Massiach ben David.

84. Furthermore, I declare that it is my sincere religious beliefs that I am a transient/Heavenly, Israeli, & Liberian/U.S. *National (via inter alia: *election, democratic, capitalistic, free market & evangelical ideologies, as well as, permanent allegiance).

85. In addition, I also aver that I am both Priest and Pharaoh of the insular minority ecclesiastical race called the Commonwealth of Israel.and founder of its **M.A.G.A.** (MAKE AFRICA GREAT AGAIN) HUMAN RIGHTS ANGELS INTERNATIONAL REGISTRY

86. I furthermore aver that I AM a Watchman of YHVH, and that I AM appointed as a Prophet/Emissary/Ambassador & Priest over these Plaintiffs, as well as, The House of Africa (and her Diaspora); in accordance with the fulfillment of the following Messianic Prophecies:

"On That Day there will be five cities in The Land of [Africa] that speak The Language of [Hebrew] and swear loyalty to YHVH/Yeshua-Tz'vaot; one of them will be called The City of Destruction (aka On or Heliopolis, i.e. The City of The Sun [of Righteousness], i.e., Yeshua!)
On that Day there will be an Altar to YHVH/Yeshua in the middle of The Land of [Africa], as well as, a Standing Stone for YHVH/Yeshua at its border. It will be a Sign and Witness to YHVH/Yeshua-Tz'vaot in The Land of [Africa]; so that when they cry out to YHVH/Yeshua for help because of the oppressors, He will send them a savior to defend and rescue them.

YHVH/Yeshua will make Himself known to[Africa]; on That Day, the [Africans] will know YHVH/Yeshua. They will worship Him with sacrifices and offerings; they will make vows to YHVH/Yeshua and keep them. Yet YHVH/Yeshua will strike Africa, both striking and healing, so they will return to YHVH/Yeshua. He will listen to their prayers, and He will heal them..

On that Day there will be a HighWay from Africa to Syria. Syria will come to Africa and Africa will worship with Syria. On that Day Israel will be a third partner with Africa and Syria, a Blessing here on earth; for YHVH/Yeshua-Tz'vaot HAS Blessed him: Blessed be Africa My people, Syria the work of My Hand, and Israel My Heritage."
(Quoting the Scroll of The Prophet Yesha ˈYAHu ("Isaiah") pbuh Chapter 19: verses 18-29)

"For this is what YHVH Elohim says': 'At the end of forty [prophetic] years I will gather the [Africans] from the people where they were scattered -  I will restore the fortunes of [Africa] and cause them to return to the Land of their origin, Patros. But they will be a humble kingdom,
(Quoting the Scroll of The Prophet Yechezk'El aka Ezeki'El (pbuh) Chapter 29 verses 13 -14)

"The Jew[ish] man said, 'I testify that there is no other [Elohim] except YHVH and that you are the true Apostle of YHVH.'
After reciting the Kalima and accepting Islam at the hands of the Prophet Muhammad (pbuh) he said; 'Last night I had a dream. In the dream I saw Musa ibn Imran (a.s.). He told me to approach you and embrace Islam as you are the Seal

of the prophets. Musa (a.s.) also instructed me to follow you and after you your successors and vicegerents. Thank be to YHVH, that He has guided me.'

Ke continued, 'So tell me O Messenger of YHVH (s.a.w.s.) who are your successors and vicegerents. So that I may recognize them and follow their guidance.' The Prophet of Islam (a.s.w.s.) replied, 'The first of them is Ali, and after him his two sons Hasan and Husain (a.s.). Attach yourself to their guidance and be careful that you do not severe your connection with them in ignorance. You shall witness the time of the birth of Ali the son of Husain (a.s.). Your death will occur during his tenure. The last thing that you shall consume in this life is (a drink of) milk.' Jundal said, 'The names of Ali, Hassan, and Husain (a.s.) in the [TaNaKh] are {in the spirit of [Eli Yahu], Shabbar and Shabbir respectively. Tell who are the Imams after them.'

'When the tenure of Husain (a.s.) comes to an end and he is martyred, Ali ibnul Husain (a.s.) will succeed him. He shall be known by the title of Zainul Asbedeen (the ornament of the worshippers). He will be my fourth successor. H e will be succeeded by his son Muhammad al-Baquir, then Jafar as Sadiq, then Musa al-Kazim, then Ali ar-Reza, then Muhammad al-Taqi, then Ali al-Hadi, then Hassan al-Askari, then his son *Muhammad who shall be known by the titles of Al-Qaim and Mahdi. And when he will reappear, he will fill the earth with justice and equity, like it would be filled with injustice and oppression. Good News is for the one who remains steadfast upon their love and friendship. They will be (those able who love Ahle Bayt) whom the Almighty has praised in His Divine Book in the verse: "This Book, there is no doubt in it, is a guide to those who guard (against evil). Those who believe in the unseen..."(Surah Baqara 2:2-3). That those who guard (against evil) are those who believe in the unseen (Imam Mahdi a.s.). It is this group of people who will be helped by Allah and these will be the successful ones.' "

Source – the book "The Dead Become Alive By The Grace Of The Holy Five; by 90010[th] Century Egyptian scholar and Author Jalaluddin Abdul Rehman Suyuti (*Prophetic Note - Momolu is a variant of Ma Mahdi, Muhammad, & Mameluke)

"This happened in order to fulfill the Words spoken through The Prophet [Yesha 'YAHu ("Isaiah") pbuh]

'OUT OF [AFRICA] I CALLED MY SON'"

(Quoting the Gospel according to MattitYahu ("Matthew"), citing The Scroll of The Prophet Hoshea ("Hosea") pbuh Chapter 11 verses 1)

## VI. PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that this court enter judgment granting plaintiffs:

15.     A declaration that the acts and omissions described herein violated plaintiffs' rights secured under the Constitution, law, & treaties of the United States.

16.     A preliminary and permanent injunction ordering defendant U.S. ex rel. to comply with this Court's Fraihat v. ICE Court Order, as well as, their Oath or Affirmation to support the U.S. Constitution by ceasing and desisting all such acts or omissions described herein.

17.     Compensatory damage in the amount of 1.5 Million US dollars against the Defendants jointly and severally.

18.     Punitive damage for the amount of 21 Million US dollars against the defendant.

19.     A jury trial on all issues triable by jury.

20.     Plaintiffs' cost in this suit.

21.     Any additional relief this court deem just, proper, and equitable.

DATE;: August 16, 2021

VERIFICATION

27

We have read the foregoing complaint and hereby verify that the matter allege therein are true. I certify under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Pharaoh Momolu V.S.Sirleaf I.,

of the **M.A.G.A.** (MAKE AFRICA GREAT AGAIN) HUMAN RIGHTS ANGELS

INTERNATIONAL REGISTRY [SEAL]

_____

Names of Signatories:

digitally signed Theophilus Agedah, IKwayee M. Tarty, Adhnanu Fahed Miri, & Thomas Nganga, Mikhail Shapovalov, Paul White, Randolph Ratclife Richards , KuacKon, Rongbin Zhang, Garesh Madevapali, Jose Susaña, Yerrisson Antonio Rodriguez, Elmer Ottonid Tenas Silva, Mr. Luis Espinoza, Paul Reyes, Jaime Daniel Navarro Cerritos, Jose O. Membreno, Rickardo Jose Guido, David Noe Alvarado, Ferardo Molina, Carlos Armando Gomez, Jimmy Nathaniel Sandoval, Santos Portillo, Alex Car-Carmo & Christian Araya, Lemos Claro Delis, Rigoberto Duran Cruz, Christian Hernandez Mej'a  & Angel Ruiz, Lucson Quacy Thorne a Guyanese National Appolon; Mandiaye Mamadou Moustapha Sene, Festus Musa, C. Thomas , L. Clavel, Quacy Thorne, Fazili Chancelier, Henry Giovanni, Sene, Thomas Olu & Boupone

Chanthachaem.

County/City of _Caroline_
Commonwealth/State of _Virginia_
The foregoing Instrument was subscribed and
sworn before me this _16_ day of _August_
_202_ by
_Momolu V.S. Sirleaf, Jr._
(name of person seeking acknowledgement)
_Linda M. Beazley_
Notary Public
My Commission Expires: _03/31/2023_

## NOTARY PUBLIC

IN WITNESS WHEREOF, I have executed this Civil Rights & Civil Liberties
Complaint asserting my rights, as well as, the rights of the abovementioned refugees
who could not assert their rights for themselves, on this 16th day of August, 2021.

Respectfully submitted.

Pharaoh Momolu V.S. Sirleaf I. [SEAL]

_Momolu S. Sirleaf Jr._

STATE OF VIRGINIA, CITY/COUNTY OF BOWLING GREEN, TO WIT:

This is to certify that the foregoing CRCL Complaint was signed

before me by _Momolu V.S. Sirleaf, Jr._ on this _16_ day of August  , 2021

29

EXHAUSTION OF ADMINISTRATIVE REMEDIES

EXHIBIT 2

*Mail*: Attn: Office of Investigations - Hotline
Department of Homeland Security
Office of Inspector General/Mail Stop 2600
245 Murray Lane, SW, Building
410 Washington, DC 20528

# M.A.G.A.

MAKE AFRICA GREAT AGAIN

# HUMAN RIGHTS ANGELS
# INTERNATIONAL REGISTRY



**CLASS TORTURE VICTIM PROTECTION ACT LAWSUIT**

1

